Thank you. May it please the court. Justice Jackson wisely said that the forefathers did not trust any government to separate truth from the false for us. But that is precisely what Maricopa County asks you to approve of them doing. Today, you're going to have the privilege of upholding the Free Press Clause or creating a new interpretation of it. One that will end its mission, at least in the Ninth Circuit. The court has already reviewed the core issue before it in the Order on Injunction Pending Appeal. And I believe that this court got it right and should not disturb that order. But perhaps augment it to make a strong statement that the Free Press Clause is not just alive and well, but vibrant in this circuit. Well, so if we just, if we all agree, and I'm just saying hypothetically, that on a facial challenge that you win, do we have to do, or if we, I'm sorry, as applies, do we have to look at the facial challenge? You do not for the purposes of an injunction, Your Honor. However, I do believe that the court should use this opportunity to strike it down also facially. I think that... But it doesn't go to the relief, right? I mean, if we were to say the as applied challenge is enough to warrant the relief you've requested, why don't we, I mean, then it goes back down, and then you're going to have, what, summary judgment, and I don't know if we get to a permanent injunction or whatever. But why wouldn't we just want to review that when it comes back up on a summary judgment? Your Honor, I think that the constitutional transgressions here are so bad that we are not here just for us. We are here for any journalists throughout the circuit that might find that they are, I'm sorry, we are here for any journalist that might be before a government agency, no matter how great or how small, that might try to use such language in order to create an environment where they get to act as my client said, and as I agree, a ministry of truth. But just to be crystal clear, that wouldn't make any difference to you for the relief that you're seeking? No, Your Honor. My client would then be permitted to continue to gather the news as he sees fit. Well, and it seems that vagueness is a quote-unquote strong medicine. So what is your strongest citation, and what case supports your argument that the county's restrictions meet this high bar? Should we find all of the restrictions vague or only some vague, or what are you asking us to do here? No, Your Honor. We are only seeking to strike down two of the portions of this regulation, just the one that says that a journalist, in order to qualify for news gathering, must avoid real or perceived conflicts of interest, and are free of associations that would compromise journalistic integrity or damage credibility. So here's where I'm struggling with that. I mean, for a facial challenge, you need to show that that would be unconstitutional in all circumstances. Now, I suppose that that's somewhat, the standard is a little bit less in the First Amendment, because there is the question of whether, there's a separate question of whether that just gives them too much discretion. But why, I mean, you can imagine scenarios where real or perceived conflicts of interest, for example, if they worked for, say Maricopa County had its own, I mean, they were, there was somebody who was working for Maricopa County, and they came in and said, well, we want to press pass because we do moonlighting for a news agency. Presumably, they could deny that and say, wait, you've got real or perceived conflicts of interest. So why would that make it facially invalid to consider perceived conflicts of interest? Well, I think the word, Judge Nelson, that you highlighted there is very important. What is a perceived conflict of interest? I don't think you can ever have a regulation that says whether or not you have First Amendment rights hinges on whether there is a perceived conflict of interest. Perhaps if there's a real one, that might be another story. So your position on one is really that it's the perceived portion of that that makes that constitutionally, facially problematic. I do, Your Honor. But I would agree that real conflicts of interest are a proper consideration. Well, then we have to decide what's a real conflict of interest. Fair enough. I mean, that and but that seems to me to get into an as applied challenge. But your position for the for the for the facial challenge, which is helpful, is that it's it's real. Are you saying that the real conflicts of interest should be facially stricken as well? At least the way you know, it's it's not just how it's as applied to Mr. Conrad's son, but also how it's applied to other TGP journalists. Remember, the preliminary injunction at this point seems to only cover Mr. Conrad's son. But the way that Maricopa County in other have a backup, have other journalists applied for a press pass front with TGP? No, not that I'm aware of, Your Honor. No, it seems to me what your argument really is. I mean, even though because like vagueness is a really high standard, but it seems to me that just because Maricopa got it wrong, just because it let's just assume that facially they use the wrong things and tried to and and they've shown by their behavior that they can't properly interpret this, that ergo it must be vague or it's vague to them because they don't get the First Amendment. That's that it seems to me that that's but but because vagueness is a very high standard, just because they choose to be hard headed about it and don't want to apply it correctly and want to fit something, you know, a square peg into a round hole or because they don't like what your thought process is or they don't like what your view of the truth is or they don't think or they think that you're because you hold certain other views, you're not of good repute that therefore it's vague. But that but I don't think that's exactly the standard for vagueness. Well, Your Honor, I mean, that's all why they would lose on an as applied. But but vagueness means, you know, but then I think Judge Nelson has pointed out to you. Well, a conflict of interest could be. That makes sense. But their idea of what a conflict of interest goes to the as applied. It does, except I think that the language here is so vague that given that we've had multiple people look at it, multiple people come to different conclusions. I just don't know that we could. You know, there's some there's some really good language. I like to quote in this circumstance, at least since 2020, that governments rarely target a speaker's viewpoint outright. For this reason, this court must take care to ensure that policies and actions that may appear neutral on their face are not in reality a facade for viewpoint based discrimination. Well, I guess I'm just wondering what what more they really would need to say to explain what a conflict of interest is. I mean, it seems to me that, you know, the standard is that it has to be clear in the vast majority of intended applications. And it seems to me that the words conflict of interest probably are. And that really the the issue here, as Judge Callahan just said, maybe what the county is doing with those words in your in your case. Well, Justice Jackson, I'm sorry. It just got promoted. OK. It's a promotion, but I would say that the the it's not just the way that they've used it. If we look at what is the purpose of the overall regulation, their stated purpose is really because they say they didn't have enough room and imposters were coming in during 2020. None of this language is necessary to get to that issue. None of the these two rules. Now, the rest of it, you know, we can argue about it one way or the other, but we're challenging no other portion of the regulation. So if you want to say that somebody we have only 50 seats and you have a regulation that says when the 51st journalist shows up, we we pick a card out of a deck and the highest card has to leave. Or you have to have actually published realist for a certain period of time, a certain amount of experience. There is plenty of regulation in this rule that would permit them to get to their stated purposes. I can't see any other use for these two sub regulations except to make value judgments about the journalist. We certainly do have people who have a what we could call a conflict of interest, depending on how we define that. I think there's some excellent argument from one of the amici being St. Michael's media where they talk about how they definitely have bias and they proudly say they have a conflict of interest. They're a Catholic publication. They're going to publish always in a way that would be biased toward Catholic views. And they also point out that this could possibly restrict all religious publications. And then they show some high points in history where just such conflicts of interest were of historical importance, namely the struggle for independence and the struggle for abolition. So I would say that if this court leaves those regulations, those regulations intact, that it cannot possibly be used in a way that I think is constitutional. You could certainly say that they could. The standards themselves or the subject matter aren't necessary. I actually have more of a problem with the second as I look at it. Both are free of associations that would compromise journalistic integrity or damage credibility. I mean, to the extent that that's speaking of something different than a conflict of interest. I mean, that's problematic. It seems to me to say both are free of associations like that. That seems to almost infringe upon the reporter's First Amendment rights to associate with who. I mean, a reporter should be able to associate with credible and non-credible people. And, I mean, that's how they kind of do their business. But I guess back to my question is the conflicts of interest is an appropriate subject matter. It's just got to be more narrowly defined here. It can't give such broad discretion to the county. I agree, Your Honor. When we as lawyers and judges think of the term conflict of interest, that seems somewhat more clear to us because we're thinking about it in terms of bar rules. We're thinking about it in terms of whether a judge would need to recuse themselves. However— But, you know, when you bring that up, we have rules for lawyers that you have to avoid, or at least as judges. We have to avoid perceived, not just real, but perceived conflicts of interest. And, you know, you wouldn't strike that down because you'd say, well, perceived is too ambiguous. I mean, I guess it's different because you don't have necessarily a First Amendment challenge to it. But, see, hypothetically, the county could get up and say, we think we're right, and we think there was an actual conflict of interest, or we think that it, you know, that we can't deny press privileges to people that we don't like who they hang out with. I mean, we still would be afraid to say, it's not vague. You just don't know what the law is, and you're putting your personal beliefs in here, and that's not a proper interpretation of the language here. I mean, so we still could come to the conclusion it's not vague, and county, you're wrong in how you're interpreting it. Certainly, but I would still urge the court to strike it down as unconstitutionally vague on its face, turning back to the discussion of how a judge or a lawyer would look at it. Remember, the purpose of that is to protect the public. The purpose of a robust First Amendment is the same purpose. It is to protect the public. It is to give the public a diversity of views, including perhaps if somebody has what someone could perceive as a conflict of interest. Well, I guess it's my understanding that the vote counting in Arizona has finally concluded. So is this case moot at this point? Not at all, Your Honor. Perhaps the vote counting has concluded, but this press pass is not just to cover vote counting. This is to cover anything to do with the Board of Elections. But are they having? Well, first of all, what is the contour of the press pass right now? Is it given for a certain period of time? Is it renewed? Is it in perpetuity? There is nothing that I saw in any of the regulations that talks about that. But I will say that there are more than 50 press passes. They had a policy of only allowing 50 in. That was unique to this election counting, correct? As far as I'm aware, Your Honor, it is that there are 50 seats in this room, so we need to limit it to only 50 people at a time. There is no record evidence of even 20 people. Has Mr. Conradson, since he's been issued the press pass, attended any press briefing and been one of the 50 in the room? I do not have that information in the record, Your Honor. I don't want to make a misrepresentation. Do you know how many more meetings have been held? I mean, is this something that outside of the elect—it seemed to me this was sort of done in the context of this vote counting. Are they holding meetings and press briefings outside of that? That is what caused the exigency of this litigation, Your Honor. However, I think if you look at the record, you see that the use of the press pass has expanded because of the county's actions. At first it was you couldn't come to press conferences without it. Then it was you couldn't access the building to interview anybody. It's not that there's no more stories to be written about the election. I don't know what stories could come up. I don't know what long-form journalism a journalist could be working with. Is that still the case? Is the press pass being used as an entrance into the building? Not just an entrance into the building. Yes, it is, but also even onto the curtilage of the property. But if he doesn't have a press pass or someone else doesn't have a press pass, they can't even enter the building? They can't even enter the parking lot, or at least Mr. Conradson can't. So he has been told nobody without a press pass can even enter the parking lot. They have to go to the cordoned-off free speech zone that is outside of the parking lot. So I think even though this case blew up in the fact of the 2022 election, it doesn't matter. These are government officials who should be subject to at least being attempted interview subjects. So if somebody is walking out of the door and he wants to shout to them, what do you say about your conflict of interest? Or what do you say about some other issue? He can't even do that. There's this buffer zone around the board of elections that only exists for people who don't have a press pass. Meanwhile, Mr. Conradson is the only one who can't do it. In fact, it appears that it has been specifically only targeted to him. I'd also like to address a question. I think my colleague, Judge Thomas, has a question. And maybe it's a question for the county, really, because I'm also sort of wondering, well, how long is this sort of going to go on with just these 50 press passes being issued? I mean, maybe you don't know. But if you're one of the 50, does that mean from now on, forevermore, you're going to be admitted to the building? I don't know what the county is going to do. The county has had shifting policies and justifications all along. Do you want to save any time for rebuttal? Because you're down to two minutes. I believe I reserved five minutes. That doesn't count. You're down to two. Do you want to reserve that? Yes, please. Okay. We'll hear from the county then. Good morning, and may it please the court, my name is Joe Branco, here on behalf of the Maricopa County Defendant Appellees. I want to cut to the chase. This case is moot. If the court turns to Excerpt of Record 426, that's where the Maricopa County 2022 elections press pass was announced. It was print out from the website. I believe it was attached to plaintiff's complaint. That makes it clear that it's to cover events related to the 2022 general election. There have been no press conferences held since December 4th. It's my understanding, therefore, that a plaintiff would not have had an opportunity to use the press pass. Further, there's nothing in the record that indicates that access to a public building is solely predicated at all times on the presence or absence of a press pass. Okay, that was a very carefully crafted sentence. You're saying it is relevant. I mean, whether you have a press pass is relevant to whether you can even enter the building? At that time, yes, your honor. But not today. Today, anybody can enter the building. As far as I understand, yes, your honor. And I want to be clear about why that was, too. And that's because part of this case has to do with the inadequacy of facilities to hold press conferences. And that is in the record, that originally they were held in a board of supervisors conference room that was limited to 50 people. There was an attempt to move it to another location, which is the Maricopa County Tabulation and Elections Center, MCTEC. That's the building we've been talking about. And the press conference is there if you were to go in either with an employee ID or a press pass at that time. That would have been back in November, and I believe parts of October when there were press conferences held. The press conferences were actually held right in the main lobby. That was the biggest area there that was on the proper side of the security center. So this idea that you need a press pass to get in there is simply not true, and it's certainly not in this record. There is some evidence about whether or not the plaintiff in this case attempted to either sneak in from the county's perspective or enter to make an appeal. Although I would also note that at ER 68, the plaintiff admitted on cross-examination that he never actually tried to appeal until 41 days later. And that's the second thing. Well, I guess what troubles me as applied is your client seems to have handed its head on a platter a little bit from the standpoint that if the county's engaged in interpreting which journalists are seeking the truth, quote-unquote, how can the regulations not be content-based? I have a hard time with that one. I understand, Your Honor, and I think that's part of the problem that we have here in terms of the record. This was a case in which – and I promise you I will answer the question as soon as I get through this preparatory part. The county had three days to prepare for this, and so I fully recognize that some of the nuance is lost here. And I think that it's really drawn out very well. I believe it's ER 119. It was when Judge Tucci was asking some questions of counsel for the county. And counsel said, you just said it better than I did, which has to do – the county's looking at the process. So things like the conflict of interest, things like the association manifest themselves in the process of news gathering. And so what we're not talking about here is we're not talking about a license to publish the news. We're not talking about a prior restraint. We're simply talking about access to a limited set of resources, which are these press passes. And counsel's correct. Opposing counsel's correct. Why are you using – Well, but it seems to me that – I mean, we live in a very polarized society, and we have human beings making these decisions. And it seems to me on some level – and I'm just speaking for myself – that your client walked right into it because this individual – I don't know this individual, but he seems like he might not be entirely pleasant on all counts. But, you know, the First Amendment means that we have to hear things sometimes that we don't want to hear. And it protects the unpopular speech. And what the truth is, that's what – we expect that debate to go on in the press about what the truth is. And it just seems like you've got county officials here not liking this person and what this person's saying. And, you know, they – you know, it's – they fell right in the trap. Respectfully, Your Honor, I think that takes the wrong inference from this very limited record. And that's because the county focused on the process of the newsgathering, not the outcome, in terms of making this determination. So one of the – Why is that relevant? Help me understand why that's relevant. The process of the newsgathering – they're all using the same process. I mean, it's almost nonsensical what you're saying. They're not using the same process because, in this case, there was a discussion about whether or not you were, as part of the newsgathering process, contacting the officials for comment is one example that was used and brought up both by the plaintiff's expert and as well by the county. And there was – I've got to be honest. What you just said seems like a blatant violation of the First Amendment. I mean, to discuss how they're doing their newsgathering, I don't even understand – First of all, I don't even see that in the standards. The standards don't talk about that. The standards talk about conflicts of interest. It had nothing to do with what you just said. Your Honor, from the county's perspective, the conflicts of interest and the associations play out in that process. In terms of – I've got to be honest. This just goes to the point that you guys can't be trusted with the First Amendment. That's crazy. The position you just took is completely in violation of the First Amendment. Your Honor, it's not in violation of the First Amendment because it isn't dependent upon the viewpoint that the speaker is taking. It wouldn't matter where on the political spectrum – I mean, it can't be right that you get to dictate who they talk to, how they go about gathering. It can't be – that can't be – it can't be right. Your Honor, the county was simply following, or perhaps from this panel's perspective, attempting to follow and failing to do so, what the Seventh Circuit laid out in terms of McIver and what the county was permitted to rely on as a reasonable government interest in journalistic integrity. The panel – there are eight people, as it was discussed below, that were on this group. It was discussed that not all have a journalistic background, but some do. And so they were interpreting it in that way, and that is the way that they attempted to apply it. Why are you doing this? Why are you doing this? I don't understand it. To Judge Callahan's point, I mean, I'm trying to give you the benefit of the doubt, but this argument is raising more red flags rather than resolving the red flags on how Maricopa County is applying these standards because everything you just said has nothing to do with conflict of interest. And if it does, it's a very contorted view of conflict of interest, and that goes exactly to the vagueness position that's being taken here. Your Honor, I would point back to the district court's order in which the denial of the – the denial of the request for the temporary restraining order and the failure of – But we know the district court got it wrong. I mean, we gave an injunction pending appeal. So, I mean, we've basically said the district court's analysis was not correct, at least on the as-applied challenge. I understand that, Your Honor. And so what I intended to talk about today was the standard of review, this court's limited review. But I can certainly read a room, and so I guess I'm at a – I would rather talk about that because you seem to be on very thin ice on the arguments you're making. You seem to be trying to defend a position that, in my opinion, is just constitutionally indefensible under the First Amendment. So the question is – I mean, it seems to me we've issued a ruling. He's got the press pass. There's two issues I think we've got to address. One is this moot. I don't think we've had briefing on whether it's moot yet. Have we? Have either of the parties filed anything on whether this case is now moot? No, Your Honor. Neither party filed anything with respect to mootness because this case was scheduled in an expedited fashion. We produced the briefing, and we've had oral argument today. Okay. So we've got to determine mootness. Your position on mootness, as we're hearing it today, is that this became moot on December 5th, effectively, the day after the last press briefing was held. Your Honor, yes. I'm not sure. To be clear, I'm not exactly sure when the exact last press briefing was. I can say that I confirmed with one of my clients today that since December 4th, there have been no press conferences. And are there any scheduled in the future? Not that I'm aware of, Your Honor. But today, as I understand it, today if somebody wants to come in and interview an official or walk into the building, they still have to show the press pass. Is that correct? I don't think that's correct, Your Honor. My understanding was that there is record evidence of this, that the only reason that this press credentialing system was even created for this year was because of the crush of media requests following 2020, and it was unexpected. So are these press passes, are they valid? Do they have any legal standing right now? If a press conference were held next month, would the county be looking to the current number of press passes that have been issued? The best answer I can give, Your Honor, and it may be unsatisfactory to the panel, is that I don't think it is, but that, of course, is something that would have to be developed in the record for me to be completely— Well, then I don't know that we can say it's moot. I'm not sure we can say it's moot. If we don't have that— And I understand that, Your Honor, and that's why I'm saying, to my understanding, having talked to my clients, there is no intention of having any press conferences for which this press pass would have any validity. Okay, so once we get past mootness, is the county continuing to challenge the as-applied— contest the as-applied challenge from Mr. Conradson? I mean, you obviously complied with our injunction pending appeal and issued a press pass, but if you had your druthers, would you take that back? Given that it's moot, no, we would allow Mr. Conradson to have it as a historical item for everyone. That wasn't my question. My question is, would you— Okay, so I'm trying to get past the mootness question. If we said there's no injunction here, would the county say, okay, well then Mr. Conradson doesn't have a— he can keep it for historical purposes, but he can't— would you say that Mr. Conradson can't have a press pass for any future press conferences? On the way things stand as they do, and keeping in mind, if I recall correctly, this court had an important footnote, I think, regarding the plaintiff's ongoing conduct and whether or not the county could take that into consideration. With that in mind, no. There is no—the press pass has no— I'm sort of stuck in the mootness, I think, Your Honor, but no, the county's not looking to bar Mr. Conradson on this basis moving forward. No, in terms of the fact that they stood as of September, which is my understanding of what this court did in its order. But it seems to me that the county still thinks it's right, and if you're advising them that they're still right, and it's just three crazy Ninth Circuit judges that are telling them that they don't understand the First Amendment, there is some concern in your legal advice going to them, and them being the arbiter of people that are coming through if they don't accept what going to content actually means or what the First Amendment means. Because I think much like what Judge Nelson said, the concern level escalated as you listed what they think is okay and that what you're telling them is okay. Your Honor, respectfully, I'm trying to make the best out of a very limited record, and so I'm simply presenting the arguments that I'm able to on this very limited factual record. I mean, each side had 45 minutes, which is roughly twice the amount of time I have today in front of this panel. And so I don't think that what was able to be produced on this, and certainly... But the county who doesn't pay for their lawyers, they don't have to go out and hire their individual lawyers, whereas the reporter has to go hire out. So aren't you in a position to say, hey, you don't understand the First Amendment here. You're wrong, and I'm not going to defend that position. Or do they just get to tell you, defend it no matter what? No, Your Honor. I, of course, would have my own individual ethical responsibilities. And you don't see that what they did was... You're still of the view that the facial challenge, that what they did as applied is fine? You're still of the view that what they did as applied is fine? Your Honor, in light of the district court reaching a different decision from this panel, and again, I understand this court's authority over the district court, I don't think that the position that the county comported with the First Amendment is inconsistent with either my ethical obligations to represent my client or our position on appeal that plaintiffs failed to produce sufficient evidence for the extraordinary remedy. I don't... I'm not sure what... And, of course, we recognize that the panel took a different decision with respect in December and clearly is taking a very different decision today. And the county attempted to do its level best to comply with what the Seventh Circuit said in its McIver decision. We will, of course... I mean, fair enough. But, I mean, McIver has some potentially broad readings, but I just... I can't even read it anywhere near the way... the interpretation that you just gave. I mean, that's the first time I've understood that that's the county's position. So the better question is, what do we need to do going forward? Because, I mean, the district court did rule and said there was no likelihood of success on the merits on the facial challenge. I mean, we could vacate that and not weigh in on that and wait for that to come up, and maybe it's moot. I mean, we could send it back down, and you guys can fight that out in the district court. Or we could weigh in on that issue. I mean, why shouldn't we, in light of what was just said, why shouldn't we come in and say, look, this is a nuclear bomb under the First Amendment in the hands of a completely incompetent operator. So we're just not going to allow these two provisions to be used by Maricopa County officials. I understand, Your Honor. I guess the concern with rendering the facial challenge is it would take it off the table for government officials across the state, whereas simply holding on as applied would only impact Maricopa County. Well, and potentially. Where else do these... There was some suggestion that these were drawn, these provisions were drawn from the White House. I thought I remembered something, that the White House press credentials were issued under similar standards. I'm not sure about that, Your Honor. It's my understanding that there are similar standards used by the Arizona Senate, and I believe in the McIver decision they say that it's... Oh, maybe that was it. It was the Senate. Okay, but it was the state Senate, not the U.S. Senate. I believe, Your Honor, the McIver at 610 to 611 discusses whether or not it's used by the United States Congress. I see. And that included both these provisions that are being challenged, the real or perceived conflicts of interest and free of associations that would compromise journalistic integrity? Those are both part of those? That I'm not sure about, Your Honor. All I know for sure is that these were adopted from the Seventh Circuit's McIver decision, which in turn was looking at the Wisconsin governor and I believe the Wisconsin legislature. Unless there are any further questions, I will yield my time. I don't think we have... My colleagues do not appear to have additional questions, nor do I. So we'll go back for... I think you have about two minutes for a rebuttal. Thank you, Your Honor. 150...let's see, how much time? Okay, so you just have about...yeah, go ahead. As a matter of the record, the elections press pass criteria are not limited only to the 2022 election. They very clearly say these will be needed in order to enter the elections department's office to conduct interviews, take photos, and or video. They don't have to be limited to the 2022 election. However, even if they are, and that's at ER 426, even if they are, there is still an ongoing elections lawsuit. This 2022 election is still alive, whether you agree with that lawsuit or not. I take no position on the merits of it, but as long as that's ongoing, the 2022 election, even if they are with this brand-new argument that I've never heard before today's oral argument, that, well, we don't use these anymore, that's just not true. It's simply not true. And additionally, if we do not strike down these two regulations, just these two little pieces, TGP has other reporters who are chilled from applying because what's the point? They're going to get rejected again. And there are additionally, I am sure, a very strong swath of people out there... I don't think you should be chilled. I think just the opposite should happen. Everyone should take comfort that the court did the right thing. It protected the First Amendment. Everyone should take satisfaction in that. I'm afraid that if it's only limited to Mr. Conradson, as applied, I don't trust the government to make the right decision the next time. Fair enough. And they're going to have that burden. They're going to have that burden on the next case that they sort of botched it up pretty badly on this one. And that's probably going to play against them in a future round. Well, and in fairness to your colleague on the other side, you've had a little easier go at oral argument than he had in terms of questioning. And so we recognize that a lot of times... I mean, I think anyone... We have no issue with counseling. We have no issue with counsel representing his client or ethical concerns at that point. But you had to answer some difficult questions, and I recognize that. And you stayed at the podium, so thank you. So take 30 seconds and wrap up here. Please don't get me wrong. I would trust Mr. Branca with my wallet or to babysit my children. I don't trust his bosses. And I would say that in order to resolve this properly and to leave the First Amendment intact, we need to recognize that this case is ongoing. It is not moot. And even if they were to pull these regulations today because they're still online telling people to apply for a press pass under these unconstitutional regulations, it is certainly capable of repetition yet evading review. All right, well, I want to thank both of you for your arguments and once again reaffirm that just because sometimes we hear arguments that we may not agree with, it doesn't mean... That's part of oral argument, too. It means both the First Amendment, you have to hear things sometimes you don't want to hear, and oral argument, we have to listen to arguments that we may agree with or we may not agree with, and it's part of the process. And I thank both of you for participating respectfully in that process. Thank you. All right, this case will be submitted and the court will be in recess until tomorrow at 9 o'clock. All rise. This court for this session stands adjourned.
judges: CALLAHAN, NELSON, THOMAS